**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| WARREN MATHEW GIDDINGS, | | |
| | * | |
| **Plaintiff,** | | |
| v. | * | Case No.: GJH-21-2735 |
| | | |
| CO CHARRIEZ, *et al.*, | * | |
| | | |
| **Defendants.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Self-represented Plaintiff Warren Mathew Giddings, an inmate presently incarcerated at Jessup Correctional Institution in Jessup, Maryland, filed this 42 U.S.C. § 1983 action against Maryland Correctional Training Center ("MCTC") correctional officers Charriez, Messer, Grubbs, Barger, Bowers, Stewart, and Durboraw,[1] as well as an unnamed "MCTC Officer" (collectively, the "Correctional Defendants"). ECF No. 1. In the Complaint, Plaintiff alleges that the Correctional Defendants: (1) denied him equal protection of the law by refusing to deliver legal mail; (2) used excessive force; and (3) retaliated against him. *Id.* In a supplement to the Complaint, Plaintiff added Defendants Corizon Health, Inc. ("Corizon"), Dr. Erwin Aldana, and Dr. Jerry Ann Hunter (collectively, the "Medical Defendants"),[2] claiming that they failed to provide medical care in a timely manner after he was transferred to the Maryland Correctional Institution in Hagerstown, Maryland ("MCI-H"). ECF No. 13. Plaintiff seeks monetary damages. ECF No. 1 at 3.

---

[1] In his Complaint, Plaintiff originally named Messer as a Defendant but later replaced him with Durboraw. ECF No. 7.

[2] Plaintiff initially identified Dr. Aldana as "MCI-H Medical Director/Supervisor" and Dr. Hunter as "MCI-H Doctor." ECF No. 13.

On May 5, 2022, the Correctional Defendants filed a Motion to Dismiss or in the Alternative for Summary Judgment (ECF No. 22), and on September 22, 2022, the Medical Defendants filed a similarly titled Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 41).  Plaintiff opposed both motions (ECF Nos. 24, 44), Defendants replied (ECF Nos. 30, 45), and Plaintiff was granted leave to file surreplies (ECF Nos. 40, 46).[3]  In addition, Plaintiff filed a Motion to Compel the production of evidence (ECF No. 26) and a Motion for Reconsideration (ECF No. 43) of this Court's previous order (ECF No. 39) denying his "Rule 37 Motion" to compel a discovery response (ECF No. 32).  As previously explained, where there has been no scheduling order issued by the Court with regard to discovery, the Court cannot compel Defendants, pursuant to Federal Rule of Civil Procedure 37, to engage in discovery.  *See* ECF No. 39.  Thus, Plaintiff's Motion to Compel and Motion for Reconsideration shall both be denied.

As to the merits of the Complaint, no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons set forth below, the Correctional and Medical Defendants' motions, construed as motions for summary judgment, shall be granted.  As the case is not proceeding with regard to Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims he seeks to add.  *See* 28 U.S.C. § 1367(c)(3).  Plaintiff's Motion to Amend (ECF No. 14) shall therefore be denied.

## I.  BACKGROUND

### A.  Plaintiff's Allegations

Plaintiff claims that during morning showers at approximately 7:00 a.m. on October 13, 2021, a correctional officer at MCTC refused to place his legal mail in the outgoing mailbox.

---

[3] The Court granted Plaintiff leave to file a surreply with regard to the Correctional Defendants' motion on September 13, 2022.  ECF No. 39.  Plaintiff sought leave to file a surreply to the Medical Defendants' motion on December 27, 2022, and that request is hereby granted, *nunc pro tunc*.

Complaint, ECF No. 1 at 3.[4]  Plaintiff states that he was assigned to disciplinary segregation at the time and thus could not place it in the mailbox himself.  *Id.*  According to Plaintiff, the officer was "hostile . . . for no apparent reason" and spoke to him in a condescending manner, presumably because Plaintiff is Black and the officer is Caucasian.  *Id.* at 4.  Plaintiff asked for the officer's name, but the officer refused to provide it.  *Id.* at 5.  Plaintiff later identified him as Officer Stewart, *Id*.

Plaintiff alleges that on October 14, 2021, Officers Grubbs, Barger, and Bowers assaulted him at the direction of their supervisor, Officer Durboraw.  *Id.* at 5; ECF No. 7.  Plaintiff states that he was attempting to pass legal material that he had prepared for another inmate when Officers Grubbs and Bowers grabbed his hands and attempted to place him in handcuffs.  *Id.* at 6.  When Officer Bowers had difficulty securing the handcuffs, Plaintiff laughed at him, and Officer Bowers "slammed the cuff" on Plaintiff's wrist, causing injuries to his wrist and thumb.  *Id.*  According to Plaintiff, the officers then lifted his arms up so hard that he collapsed and proceeded to slam his face into the concrete.  *Id.*  Plaintiff states that he heard the officers laughing before they dragged him into a holding cage and Officer Barger yelled a derogatory term.  *Id.* at 6. Subsequently, Officer Charriez ripped open the legal mail that Plaintiff was trying to deliver.  *Id.* at 7.  On the following day, Officers Grubbs, Barger, and Bowers retaliated against Plaintiff for the previous day's incident by denying him recreation time.  *Id.*

Plaintiff states that as a result of the officers' alleged use of excessive force, he suffered a concussion and damage to his orbital bone, nerves, and jaw.  *Id.* at 7.  He claims that he had to wait over a month to see a medical provider for his injuries.  Supplement, ECF No. 8 at 5.

---

[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Following his transfer to MCI-H on December 23, 2022, he was not seen by a doctor for his eye injury for at least three months.  Second Supplement, ECF No. 13 at 1-2.  Plaintiff states that he had sick calls with nurses and that he wrote to the medical supervisor at MCI-H but was ignored. *Id.* at 2-3.

### B.  Correctional Defendants' Response

According to the Correctional Defendants, Officers Stewart and Faith escorted Plaintiff for showers on October 13, 2021.  Case Summary, ECF No. 22-4 at 6-7.  Later that day, Plaintiff filed a request for Administrative Remedy Procedure ("ARP") claiming that the officers refused to deposit his legal mail in the mail system.  ARP, ECF No. 22-4 at 4.  Following an investigation into the matter, it was determined that neither officer recalled Plaintiff making any requests.  *Id.* at 6-7.  It was also noted that Plaintiff "has a history of claiming racial discrimination in an attempt to manipulate staff and gain privilege."  *Id.*  Thus, Plaintiff's ARP was dismissed.

With regard to the alleged assault on October 14, 2021, Officer Grubbs recalled the incident as follows:

> Officer J. Barger COII and Officer B. Bowers COII were attempting to move inmate Giddings, Warren 472713 from HU7-D-I-2-B to HU7-A-1-2-B when I, Officer C. Grubbs, COII, arrived to tell them that he could not go into HU7-A-1-2 due to having no power to the cell.  After I told inmate Giddings he was going to a different cell, he became angry and said he had to pass some legal work to another inmate on D Tier.  Officer A. Charriez COII told inmate Giddings that after he searched the legal paperwork that he would pass it to the inmate it needed to go to.  Inmate Giddings was still upset.  Ofc. Bowers told inmate Giddings to go to A Tier.  Inmate Giddings then started to walk away and said "youa a bunch of bitch ass niggers."  At that point Officer Bowers ordered inmate Giddings to place his hands behind his back to be placed into handcuffs.  Inmate Giddings did not comply.  I then went to inmate Giddings right side, and inmate Giddings was starting to pull away from Officer Bowers so I held inmate Giddings by his wrist and elbow to gain control of him.  Officer Bowers' handcuffs were getting stuck on inmate Giddings undershirt, making it difficult to place the handcuffs on the inmate.  Inmate Giddings was also struggling to free himself from the handcuffs.  Inmate Giddings was shouting that "All you motherfuckers are lucky.  If I get my hand free, I am swinging on all you cracker ass niggers."  I then applied downward pressure on inmate Giddings shoulder to keep him still so that the handcuffs could be placed on

him and to prevent him from spitting at an officer. Officer Barger and I then turned inmate Giddings around, using a hands on escort to be taken to a holding cage, continuing to apply downward pressure to inmate Giddings' shoulders to keep him from spitting on us. Inmate Giddings was still struggling against us and stopped walking, collapsing to the floor. Ofc. Barger and I went to the ground with inmate Giddings, to maintain control. Once on the ground, I placed my hand on inmate Giddings head to make sure he didn't spit towards Ofc. Barger. I then noticed inmate Giddings was attempting to pull his right hand free of the handcuffs. I readjusted the handcuffs to make sure they were secure. Inmate Giddings was then picked up off the floor and placed into a holding cage. Once in the holding cage inmate Giddings continued to threaten all of us that were present including Officer Barger, Officer Bowers and myself. He said "I will see all of you in court, I am suing all of you cracker ass bitches."

Notice of Inmate Rule Violation, ECF No. 22-4 at 44. Officers Barger, Bowers, and Charriez also submitted Use of Force Incident Reports, consistent with that of Officer Grubbs. *Id.* at 20-27. The incident was investigated, and the Use of Force investigators found that the correctional officers' actions were in accordance with established directives and policies. *Id.* at 15.

Video recording submitted by the Correctional Defendants reflects that the incident took place from 9:18-9:21 a.m. on October 14, 2021. *See* ECF No. 25. By 11:39 a.m., Plaintiff was presented to the MCTC medical unit following the Use of Force incident, at which time he stated that he wanted his face and arm documented so he could "sue[] and get some money." Medical Records, ECF No. 22-11 at 3. On examination, Plaintiff's vital signs were stable, and he was in no acute distress. *Id.* There was redness by his right eyebrow and below his right eye, but no bleeding, swelling, or tenderness. *Id.* In addition, his arms had no redness, bruising, deformities, or tenderness. *Id.* Plaintiff was educated on the plan of care, and he verbalized agreement. *Id.* He was seen in the MCTC medical unit four more times between October 17 and 28, 2021, and again on November 16, 2021. *Id.* at 5-22.

With regard to Plaintiff's allegation that officers retaliated against him, the Correctional Defendants state that they did not deny Plaintiff out of cell activity on October 15, 2021. *See* Decl. of Grubbs, ECF No. 22-6 at ¶ 11. Rather, the daily record documenting inmate activity for

5

disciplinary segregation, where Plaintiff was housed at that time, reflects that Plaintiff refused "out of cell activity" on that day.  ECF No. 22-4 at 98.  In addition, showers were not available to Plaintiff's housing unit because it was a Friday, and showers were scheduled for Tuesdays, Thursdays, and Saturdays.  *Id.*

Plaintiff filed ARPs regarding the incidents on October 13, 14, and 15, 2021.  *Id.* at 4, 92; *see also* ECF No. 22-13 at 12.  The first, ARP No. MCTC-0781-21, alleging the officers' refusal to deposit his mail, was dismissed on November 30, 2021.  ECF No. 22-4 at 3.  Plaintiff appealed to headquarters on December 2, 2021.  *Id.* at 13.  After his appeal was dismissed for procedural reasons on December 23, 2021, Plaintiff filed a grievance with the Inmate Grievance Office ("IGO") on January 18, 2022.  ECF No. 22-13 at 3.

The second ARP, No. MCTC 0793-21, alleging the officers' use of excessive force, was dismissed on November 15, 2021, following an investigation.  *Id.* at 16.  Plaintiff filed an appeal of the Warden's decision on November 30, 2021, and headquarters dismissed the appeal, finding that the Warden fully addressed the complaint.  *Id.* at 13, 15.  On January 12, 2022, Plaintiff filed a grievance with the IGO, which was dismissed as wholly lacking in merit by letter dated January 31, 2022.  *Id.* at 11-12.

Plaintiff's third ARP, No. ARP 0794-21, alleging that he was purposefully denied recreation time, was dismissed on November 30, 2021.  ECF No. 22-4 at 91.  Plaintiff filed an appeal on December 2, 2021, which was dismissed for procedural reasons.  *Id.* at 100-01.  On January 8, 2022, Plaintiff filed a grievance with the IGO.  ECF No. 22-13 at 26.

Plaintiff initiated the instant suit on October 16, 2021, prior to the resolution of any of his ARPs, appeals, or grievances.  *See* ECF No. 1; ECF No. 1-1 at 2; *Houston v. Lack*, 487 U.S. 266, 276 (1988) (holding that a prisoner's submission is deemed to have been filed on the date it was deposited in the prison mailing system).

6

### C.  Medical Defendants' Response

The Medical Defendants state that Plaintiff was transferred from MCTC to MCI-H on December 22, 2021.  Decl. of Aldana, ECF No. 41-3 at ¶ 16.  On January 12, 2022, Plaintiff saw a nurse in sick call for COVID-19 screening and complaint of visual impairment.  Medical Records, ECF No. 41-4 at 41.  The nurse performed a Snellen eye exam, finding that Plaintiff's vision was 20/30 in the right eye and 20/15 in the left eye.  *Id.*  She referred him to Optometry.  *Id.*

On February 6, 2022, Plaintiff returned to the MCI-H medical unit with complaints of enuresis (loss of bladder control at night) and eye pain.  *Id.* at 36.  The nurse on duty placed another referral to Optometry.  *Id.*  During a medical visit on February 12, 2022, Plaintiff stated that he felt his right eye was swelling and had pressure and "just wants to shut."  *Id.* at 33.  On examination, the eye did not appear swollen although it looked somewhat larger than left.  *Id.*  The nurse noted she would consult with scheduling, presumably for the Optometry appointment.  *Id.*

Dr. Aldana, the Medical Director at MCI-H at the time, saw Plaintiff for the first and only time on February 24, 2022, for complaints of floaters and pressure in his eyes, elevated liver enzymes, and elevated alkaline phosphate levels.  *Id.* at 30.  Upon examination, Plaintiff was in no acute distress, and he exhibited no abnormalities in his eyes or in any other aspect of his physical examination.  *Id.*  Nonetheless, Dr. Aldana submitted a referral request to Optometry/ Ophthalmology and ordered labs.  *Id.*

Plaintiff saw ophthalmologist Dr. Amy Green-Simms for an initial consultation on March 15, 2022.  Ophthalmology Record, ECF No. 41-7.  At that time, Plaintiff reported a right eye injury in October 2021 and floaters to his right eye.  *Id.*  He reported he was slammed on the ground on his right eye and was given antibiotic drops.  *Id.*  Plaintiff also stated his right eye was red and blurry, although the blurriness was better.  *Id.*  He denied double vision (diplopia) or flashes.  *Id.*  Plaintiff was alert and oriented to person, time, and place.  *Id.*  His uncorrected visual acuity was

20/30 in the right eye and 20/20 in the left eye. *Id.* His intraocular eye pressure was 21 in the right eye and 19 in the left eye, which was normal. *Id.* Dr. Green-Simms dilated Plaintiff's eyes for the examination and found that his cup to disc ratio was 0.2/0.2, which indicates healthy eye nerves. *Id.* Dr. Green-Simms explained the signs and symptoms of a retinal tear or detachment in detail with Plaintiff and noted in the Periphery section that he had neither. *Id.* She assessed post trauma to the right eye, which only needed to be monitored. *Id.* Plaintiff was advised to return in six months. *Id.* According to Dr. Green-Simms, the eye exam was normal. Decl. of Green-Simms, ECF No. 41-6 at ¶ 4.

On March 20, 2022, Plaintiff saw a nurse at MCI-H for complaints of pink eye in his right eye. ECF No. 41-4 at 22. Plaintiff denied pain, burning, itching, and blurred vision, though his eye appeared pink. *Id.* The nurse consulted with a physician, who ordered eye drops. *Id.* On March 25, 2022, Plaintiff saw the same nurse, again for complaints of pink eye in his right eye. *Id.* at 20. She referred him to a provider. *Id.*

On April 12, 2022, Plaintiff saw Dr. Abduzahed Jahed for chronic care. *Id.* at 16. On examination, Plaintiff's eyes had no exophthalmos (bulging of the eye), his pupillary reaction was normal, and his extraocular movement was intact. *Id.*

Defendant Dr. Hunter was previously employed by Corizon Health, Inc. as a medical doctor at MCI-H from June 3, 2019, until July 2, 2022. Decl. of Hunter, ECF No. 41-5 at ¶ 2. While at MCI-H, she never served as the medical director or medical supervisor, nor did she have any contact with Plaintiff. *Id.* at ¶¶ 2, 4.

## II.   STANDARDS OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) "tests the sufficiency of the claims pled in a complaint." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019). To overcome a Rule 12(b)(6) motion, a complaint must allege sufficient facts to

state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

In evaluating the sufficiency of the plaintiff's claims, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in original) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).  However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement[.]"  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  Accordingly, in ruling on a motion brought under Rule 12(b)(6), a court "separat[es] the legal conclusions from the factual allegations, assum[es] the truth of only the factual allegations, and then determin[es] whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'"  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012) (quoting *Iqbal*, 556 U.S. at 1949–50).

*Pro se* complaints must be construed liberally and must be "held to less stringent standards than formal pleadings drafted by lawyers."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  "Dismissal of a pro se complaint for failure to state a valid claim is therefore only appropriate when, after applying this liberal construction, it appears '*beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.'"  *Spencer v. Earley*, 278 F. App'x 254, 259–60 (4th Cir. 2008) (emphasis in original) (quoting *Haines v. Kerner*, 404 U.S. 519, 521 (1972)).  However, despite this liberal construction requirement, "[p]rinciples requiring generous construction of *pro se* complaints are not . . . without limits."  *Beaudett v. City of*

*Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  Courts are not required to "conjure up questions never squarely presented to them" nor "construct full blown claims from sentence fragments." *Id.*

The motions filed by Defendants are styled as motions to dismiss or in the alternative, for summary judgment.  If the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment.  Fed. R. Civ. P. 12(d).  When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*  When the moving party styles its motion as a "Motion to Dismiss or for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998).  Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery.  *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre- or post-discovery).

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006).  The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts.  *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).  If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 322–23.

A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248–49.   However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).   The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24).   When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Here, because the Court considers evidence submitted by the parties, the Defendants' Motions will be reviewed as motions for summary judgment.

## III.   DISCUSSION

### A.  Correctional Defendants

In their Motion to Dismiss or in the Alternative for Summary Judgment, the Correctional Defendants raise the affirmative defense that Plaintiff has failed to exhaust his administrative remedies.  ECF No. 22-1 at 11-13.  If Plaintiff's claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.

The PLRA provides that a prisoner cannot bring a claim "with respect to prison conditions under section 1983 of this title … until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  A Prisoner is defined as "any person incarcerated or detained

11

in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  For purposes of the PLRA, "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this Court will hear the claim.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record."  *Bock*, 549 U.S. at 219.  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. 2d at 530.

Because the Court may not consider an unexhausted claim, *see Bock*, 549 U.S. at 220, in a very real sense, exhaustion prior to federal suit is mandatory.  Therefore, a court ordinarily may not excuse a failure to exhaust.  *Ross v. Blake*, 578 U.S. 632, 639 (2016) (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines."  *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).  Importantly, however, the Court must ensure that "any defects in exhaustion were not

procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Moreover, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *see Ross*, 578 U.S. at 636. An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at1225); *Kaba*, 458 F.3d at 684.

In Maryland prisons, plaintiffs must file an ARP in order to exhaust their administrative remedies. Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. Md. Code Regs. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual responsible for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. Md. Code Regs. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the IGO. *See* Md. Code. Ann., Corr. Servs. ("C.S") §§ 10-206, 10-210; Md. Code Regs. § 12.07.01.05(B). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* Md. Code. Regs. § 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of Department of Public Safety and Correctional Services for purposes of judicial review. C.S. § 10-207(b)(2)(ii). If the grievance is dismissed, the "order of dismissal shall be forwarded to the complainant within 60 days after the complaint was submitted to the Office." C.S. § 10-207(b)(2)(i).

Exhaustion requires full completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93

(2006).  This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'"  *Woodford,* 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original).

Here, Plaintiff filed ARPs regarding the incidents on October 13, 14, and 15, 2021.  However, it is clear that he initiated this suit prematurely, as he mailed the Complaint on October 16, 2021, prior to the adjudication of his ARPs and grievances.  As it appears that Plaintiff did not completely pursue his administrative remedies before filing suit, his claims are unexhausted and cannot be considered by the Court.

In any event, even if the Court were to review Plaintiff's claims, they would fail.  With regard to his claim that he was denied equal protection of the law because correctional officers refused to place his legal mail in the mailbox, he fails to demonstrate that he was treated differently than similarly situated inmates.  *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Veney v. Wyche*, 293 F.3d 726, 730-31 (4th Cir. 2002).  To the extent he alleges that he was denied access to courts, his claim likewise fails.  A critical requirement of an access-to-courts claim is that a prisoner must show "actual injury" to "the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."  *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)).  Plaintiff has not identified any claim that was frustrated, nor does he describe any actual injury that resulted from the loss of such a claim.

With regard to Plaintiff's claim that the Correctional Defendants used excessive force, the record before the Court, including the video evidence, shows that force used by correctional staff on October 14, 2021, was applied in a good faith effort to maintain or restore discipline.  *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  From the video recording, it appears that Plaintiff

fell to the ground without being pushed or forced.  And, given that he was brought to the medical unit following the incident, the Court cannot find that force was applied maliciously and sadistically.  *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Lastly, as to Plaintiff's retaliation claim, he has not demonstrated an impairment of his constitutional rights amounting to a showing of adversity.  *See Perry v. Sindermann*, 408 U.S. 593, 599 (1972) (citing *Board of Regents v. Roth*, 408 U.S. 564, 576-78 (1972)).  Based on the record before the Court, Plaintiff declined out of cell activity on October 15, 2021, and he was not scheduled for a shower on that day.  Thus, the Correctional Defendants would be entitled to summary judgment on Plaintiff's claims.

### B.  Medical Defendants

Plaintiff asserts a violation of the Eighth Amendment for deliberate indifference to his medical needs based on the Medical Defendants' alleged failure to provide timely and adequate treatment for his eye.  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *Hudson v. McMillan*, 503 U.S. 1, 9 (1992).  A medical condition is serious when it is "so obvious that even a lay person

would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241 (citation omitted).  As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto v. Stansberry*, 841 F.3d 219, 226 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."  *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844); *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").  Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).

An inmate's mere disagreement with medical providers as to the proper course of treatment also does not support a claim under the deliberate indifference standard.  *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977).  Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable

16

effort to care for the inmate's medical problems. *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury.  Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Farmer*, 511 U.S. at 837).  But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Here, Plaintiff claims that the Medical Defendants were deliberately indifferent to his serious medical needs because he did not see a doctor for his eye injury for at least three months. From the record before the Court, it is clear that Plaintiff was brought to the medical unit at MCTC following the Use of Force incident on October 14, 2021.  At that time, Plaintiff's vital signs were stable, and he was in no acute distress.  Although there was redness by his right eyebrow and below his right eye, no bleeding, swelling, or tenderness was observed, and Plaintiff agreed to the proposed plan of care.  Plaintiff then continued to be monitored while he was at MCTC.

Following his transfer to MCI-H, Plaintiff reported problems with his right eye beginning January 12, 2022.  A nurse performed a preliminary exam and referred him to Optometry.  During a visit with Dr. Aldana on February 24, 2022, Plaintiff exhibited no abnormalities in his eyes or in any other aspect of his physical examination.  In any event, Dr. Aldana submitted a referral request to Optometry/Ophthalmology and ordered labs.

Plaintiff saw ophthalmologist Dr. Amy Green-Simms on March 15, 2022, during which time his exam was normal.  Thereafter, Plaintiff was treated by MCI-H medical staff for reports of

pink eye, and as of April 12, 2022, a physician found that his eyes had no exophthalmos, his pupillary reaction was normal, and his extraocular movement was intact.

On this record, Plaintiff has not presented facts that set forth a cognizable claim of deliberate indifference to a serious medical need. Specifically, Plaintiff has not shown that the Medical Defendants failed to make a reasonable effort to care for his injury. As stated above, his disagreement regarding the course of treatment is not enough to support a deliberate indifference claim. Moreover, as Plaintiff's eye exams were "normal" in March and April 2022, it does not appear that any delay in scheduling his visit to Optometry/Ophthalmology exposed him to a serious or significant injury. *See Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980) (delay "does not violate the Eighth Amendment where the seriousness of the injury is not apparent"). In sum, Plaintiff fails to state a claim for deliberate indifference.

Moreover, Plaintiff's claims against the Medical Defendants are without merit because it it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal

link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct by the Medical Defendants. As he has not shown that his Eighth Amendment rights were violated in connection with his medical care, he has necessarily failed to demonstrate that any of the Medical Defendants authorized or were indifferent to any such violation. Nor do his assertions demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). Plaintiff's medical record reflects that he was routinely seen by medical staff. Therefore, the Medical Defendants are entitled to summary judgment on this ground as well.[5]

---

[5] To the extent that Plaintiff also brings medical negligence claims, the Court declines to exercise supplemental jurisdiction over them. See 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). These claims are dismissed without prejudice. *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). To sustain a medical malpractice claim in state court, Plaintiff must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claim for damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).

IV.     **CONCLUSION**

For the foregoing reasons, the Defendants' motions, construed as motions for summary judgment, shall be granted.  Plaintiff's Motion to Add Claims, Motion to Compel Production, and Motion for Reconsideration of Discovery Related Matters shall be denied.

A separate Order follows.


Date:  _January 31, 2023_              ___/s/_____
                                       GEORGE J. HAZEL
                                       United States District Judge